IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| TURN AND BANK HOLDINGS, LLC, and PRECISION AIRMOTIVE, LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 1:19-CV-503 |
| AVCO CORPORATION and AVSTAR FUEL SYSTEMS, INC., | ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, District Judge.

Plaintiffs Turn and Bank Holdings, LLC, and Precision Airmotive, LLC, ask this Court for a preliminary injunction barring defendants Avco Corporation and AVStar Fuel Systems, Inc. from selling fuel injection servos, a component of aircraft engines, bearing trademarks the plaintiffs contend are confusingly similar to their own. The plaintiffs have shown a likelihood of success on the merits. To the extent the plaintiffs seek to prevent the defendants from selling servos with the infringing marks while this litigation is pending, they have met the other requirements for a preliminary injunction, and the motion will be granted. To the extent the plaintiffs seek a broader preliminary injunction, they have not met their heavy burden, and the motion will be denied.

The Court, having reviewed the motions, the supporting documents, all matters of record, and the briefing, makes the following findings of fact and conclusions of law for the purpose of this Order only.

# FINDINGS OF FACT

1.  Plaintiff Turn and Bank holds trademark rights over marks used on fuel injection servos, which control the delivery of a combustible fuel-air mixture to aircraft engines. Doc. 1 at ¶¶ 13, 17; *AVCO Corp. v. Turn & Bank Holdings, LLC*, No. 4:12-CV-01313, 2018 WL 1706359, at *2, *9 (M.D. Pa. Apr. 9, 2018); *see also* Doc. 1-1 (USPTO registrations). Turn and Bank bought this servo line in 2012 and licensed its intellectual property rights to Precision for servo production. Doc. 1 at ¶ 17. For ease of reading, the Court will refer to the plaintiffs Turn & Bank and Precision collectively as Precision.

2.  Precision's predecessor, the Bendix Corporation, developed fuel injection servos in the 1960s and affixed the marks at issue to identify its servos. Doc. 1 at ¶ 14; Doc. 7-1 at ¶ 5. The marks have been used on servos consistently, exclusively, and prominently for years by Precision and its predecessors. *AVCO Corp.*, 2018 WL 1706359, at *8.

3.  Precision's servo marks consist of the prefix "RSA" followed by a series of numbers and letters. Doc. 1 at ¶ 15; Doc. 7-1 at ¶ 5. "All of the RSA model numbers consist of (1) the letters 'RSA,' (2) a dash, (3) a one- or two-digit number, (4) two more letters, and (5) a one-digit number—in that order (*e.g.*, 'RSA-5AD1,' 'RSA-10ED2')." *AVCO Corp.*, 2018 WL 1706359, at *3; *see also* Doc. 1 at ¶ 15.

4.  While there is not complete consensus over the precise meaning of these model numbers, in the past the parties have agreed that the numbers and letters after the dash indicate different functional or structural aspects of the servos. *AVCO Corp.*, 2018 WL 1706359, at *3. Each model number represents not a specific servo but rather a "family" of servos sharing certain general functional characteristics. *Id.* at *4.

5.  The marks are more akin to general model numbers than part numbers. Numerous servos may share the same model number, but a part number is required to ensure it is compatible with a specific engine. *Id.* at *4.

6.  Precision's RSA marks appear on servo "data tags" affixed to the servos. Doc. 29-3 at ¶ 13.

7.  Precision has registered both the RSA prefix and three of the full model numbers at issue here on the USPTO's Principal Register, and it has registered the remainder on the Supplemental Register. Doc. 1-1.

8.  Servo buyers have used the RSA marks for decades to identify the Bendix/ Precision line of servos. Doc. 1 at ¶ 20; Doc. 7-1 at ¶ 8; Doc. 7-6 at ¶ 5; Doc. 7-13 at ¶ 8; Doc. 7-14 at ¶ 6.

9.  Even without the prefix RSA, some in the servo industry recognize the suffixes "5AD1," "10AD1," and "10ED1" as originating from the Precision line of servos, Doc. 7-2 at ¶ 7, and use these suffices as a "shorthand" for the entire RSA mark. Doc. 7-12 at ¶ 5; Doc. 7-13 at ¶ 10; Doc. 7-14 at ¶¶ 6–8; Doc. 7-15 at ¶ 6.

10. In previous trademark litigation between these same parties, the Middle District of Pennsylvania found there was "overwhelming evidence showing that, in [the] minds of the relevant consumers, the primary significance of the RSA marks is to refer to Bendix and its successors-in-interest." *AVCO Corp.*, 2018 WL 1706359, at *7. The marks are not generic but are descriptive and have acquired secondary meaning. *Id.* at *7–8.

11. Precision's RSA marks are valid and protected trademarks. *Id.* at *11.

12. Defendant Avco purchased servos from Precision's predecessors for decades. Doc. 1 at ¶ 24; Doc. 7-6 at ¶ 13.

13. Around 2002, Avco began pressuring Precision to reduce its servo pricing. Doc. 1 at ¶ 24. When that company refused, Avco contracted with defendant AVStar to reverse-engineer the servos and sell them to Avco. *Id.* at ¶¶ 24–26, 28; *see* Doc. 29-3 at ¶ 3.

14. As early as 2010, AVStar and Avco began selling reverse-engineered servos bearing RSA marks identical to Precision's RSA marks. Doc. 29-3 at ¶ 8; Doc. 1 at ¶ 30.

15. No other company besides Precision and its predecessors had used the RSA marks, with or without the suffixes, *e.g.*, "5AD1," until AVStar and Avco started using identical marks. *AVCO Corp.*, 2018 WL 1706359, at *8; Doc. 7-13 at ¶ 8.

16. AVStar has and is directly competing with Precision in the servo market for the same customers. *AVCO Corp.*, 2018 WL 1706359, at *10.

17. AVStar intentionally copied Precision's RSA trademarks in full. *Id.* at *8 (finding "comprehensive" evidence that AVStar intentionally copied the RSA marks).

18. AVStar's use of identical RSA marks on its servos infringed on Precision's trademark rights. *Id.* at *11.

19. Avco induced AVStar's infringement. *Id.*

20.	For ease of reading hereafter, and because the defendants have acted collectively as is relevant here, the Court will refer to defendants Avco and AVStar collectively as AVStar.

21.	AVStar's infringement caused consumer confusion. *AVCO Corp.*, 2018 WL 1706359, at *10.

22.	In the previous litigation, Precision prevailed at summary judgment on liability against AVStar arising out of AVStar's use of the RSA trademarks. *See generally AVCO Corp.*, 2018 WL 1706359. In April 2018, the Pennsylvania court found that the RSA marks were valid trademarks and that AVStar was infringing the marks. *Id.* at *11.

23.	Soon after the Pennsylvania decision, AVStar began the process of obtaining approval from the Federal Aviation Administration ("FAA") to sell and use the same servos with a new mark. The new mark replaced the "RSA" prefix with "LFC" but retained the same model numbers as suffixes, *i.e.*, "LFC-5AD1," "LFC-10AD1," and "LFC-10ED1." *See* Doc. 1 at ¶ 33; Doc. 7-7 at 10–11; Doc. 29-3 at ¶¶ 17–18; Doc. 29-2 at ¶ 9.

24.	In using the suffixes and simply changing the three-letter prefix, AVStar intentionally copied the letter/number combinations originally used by Precision.

25.	AVStar first mentioned in court filings in May 2018 that it was seeking FAA approval for the LFC servos. *See* Doc. 7-7 at 14.

26.	It took about four months to obtain FAA approval, *see* Doc. 29-2 at ¶¶ 9–10; Doc. 29-3 at ¶ 17, and Avco and AVStar began selling servos and engines with LFC servos in July 2018. Doc. 29-3 at ¶ 17.

27.	In order to obtain FAA approval to use the LFC servos in Lycoming engines,[1] AVStar had to demonstrate the functional design of its LFC servos was "at least equal" to Precision's RSA servos. Doc. 29 at 28; Doc. 29-5 at 16.

28.	It cost more than $8500 for the defendants to switch from the RSA marks to the LFC marks. Doc. 29-2 at ¶ 16.

---

[1] Lycoming engines is an unincorporated division of Avco Corporation that manufactures and sells aircraft engines. Doc. 7-1 at ¶¶ 9, 19. For decades Lycoming used and incorporated servos made by Precision and its predecessors into its engines. *Id.* at ¶ 19. Lycoming ceased purchasing servos from Precision in 2012. *Id.* at ¶ 23. Lycoming is now AVStar's principal customer for servos. Doc. 29-3 at ¶ 14.

29. AVStar sells its servos to another engine manufacturer, Continental Motors, with an entirely different mark, "CFC-370," which does not use the Precision suffixes. Doc. 1 at ¶ 41; Doc. 1-2; Doc. 7-12 at ¶ 8. These sales had begun by early 2019. Doc. 7-12 at ¶¶ 7–8.

30. In early 2019, Precision began hearing that AVStar was selling servos with another mark to Continental Aerospace Technologies, but its president learned that the mark on those servos did not use the RSA suffixes. Doc. 7-12 ¶ 7–8.

31. In April 2019, Precision obtained emails from AVStar employees confirming that AVStar-produced servos would bear a new LFC mark but retain the previous RSA mark's suffix. Doc. 7-12 at ¶ 9.

32. There is evidence of at least one sale of an engine with an LFC servo in North Carolina as of July 2019. Doc. 15-4 at ¶ 19; Doc. 34-1. The customer ordered the engine containing an LFC servo in late 2018. Doc. 34-1 at ¶ 4. Otherwise, no party has provided any evidence about the number of LFC servos sold. *See* Doc. 34-3 at ¶ 4 (indicating all parties have this information). It is likely that the number sold has been fairly small, since Precision did not learn its only competitor had entered the market with the LFC servos until April 2019.

33. It is not necessary for safety, for functionality, or for regulatory reasons that AVStar use the RSA-associated suffixes. *AVCO Corp.*, 2018 WL 1706359, at *3, *8. There is no evidence that the FAA requires AVStar to use the LFC marks on servos.

34. The servos made by Precision and by AVStar differ somewhat in appearance, *see* Doc. 29-3 at ¶ 12, and have variations in their maintenance and service instructions. Doc. 7-15 at ¶ 8.

35. As of 2018, Precision's parts were not FAA approved for installation in AVStar servos. Doc. 7-15 at ¶ 7.

36. Some users of AVStar servos have experienced abnormal performance or failure rate issues as compared to Precision's servos. Doc. 7-4 at ¶ 12; Doc. 7-5 at ¶¶ 11–13.

37. Servos are sold to a specialized market and not to the general public. Doc. 7-1 at ¶ 10.

38. Precision and AVStar use some of the same channels of advertising for their servos. *AVCO Corp.*, 2018 WL 1706359, at *8; *see also* Doc. 7-12 at ¶ 9.

39.    There is no direct evidence that any buyer or user of an AVStar LFC servo has believed that the servo originated from Precision. *See, e.g.*, 34-1 at ¶ 6.

40.    Consumers in the field have long referred to Precision servos by a shorthand reference to the suffix and there is wide association of the suffix with Precision parts. Doc. 7-15 at ¶ 6; Doc. 7-13 at ¶¶ 8, 10. Because aviation companies change names over time, the different prefix and other marks with AVStar's name on the servo do not avoid confusion with Precision's servos, Doc. 7-13 at ¶ 11, and repair persons in the field who receive a servo with an "LFC-5AD1" mark would be very likely to first call Precision to confirm whether it was one of its units. Doc. 7-14 at ¶ 9.

41.    Servos are an aviation part that require FAA approval. Doc. 1 at ¶ 13; Doc. 29-2 at ¶¶ 5–6; Doc. 29-3 at ¶ 6; s*ee generally AVCO Corp.*, 2018 WL 1706359, at *3.

42.    Any change to the mark on servo data tags is considered a modification of Type Design and requires FAA approval. Doc. 7-8 at ¶ 5; *see* Doc. 29-2 at ¶ 9. Changes to marks also require FAA approval to change Service Bulletins, manuals, and Type Certificate Data Sheets using these marks. Doc. 7-8 at ¶ 9; *see generally* Doc. 29-2 at ¶¶ 6–7.

43.    Any change in the marks will also require changes to Avco's Instructions for Continued Airworthiness, which are required by federal aviation regulations. Doc. 29-2 at ¶¶ 17–20.

## CONCLUSIONS OF LAW

To obtain a preliminary injunction, a party must show that: (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm if the injunctive relief is denied, (3) the balance of equities tips in its favor, and (4) injunctive relief would be in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord United States v. South Carolina*, 720 F.3d 518, 533 (4th Cir. 2013). "Satisfying these four factors is a high bar, as it should be." *SAS Inst., Inc. v. World Programming Ltd.*, 874 F.3d 370, 385 (4th Cir. 2017), *cert. denied*, 139 S. Ct. 67 (2018).

Indeed, a preliminary injunction is an "extraordinary remedy involving the exercise of very far-reaching power, *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013),

and it should be granted only where necessary in order to protect property rights against otherwise irreparable injuries, *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994).[2]  In the appropriate case, preliminary injunctions "protect the status quo" and "prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." *In re Microsoft Corp. Antitrust Litig.,* 333 F.3d 517, 525 (4th Cir. 2003), *abrogated on other grounds by eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006) (citing *Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14, 16 (4th Cir. 1997)).

## I.    Likelihood of Success on the Merits

To succeed on the merits, Precision must prove infringement, which requires that they show ownership of a valid, protectable trademark and that the defendants' use of the allegedly infringing mark is likely to cause confusion among consumers.  *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 930 (4th Cir. 1995).  Here, there is no dispute that Precision and Turn and Bank are the owners of the RSA marks at issue and that Avco and AVStar[3] use the allegedly infringing LFC mark.

### A. Validity

Precision is likely to be successful on its claim that the RSA mark is valid. Another court has found there are no disputed issues of material fact about validity, and,

---

[2] The Court omits internal citations, alterations, and quotation marks throughout this opinion, unless otherwise noted.  *See United States v. Marshall*, 872 F.3d 213, 217 n.6 (4th Cir. 2017).

[3] As noted *supra* at ¶¶ 1, 20, for ease of reading, the Court will generally refer to Turn & Bank and Precision jointly as Precision, and to AVStar and Avco jointly as AVStar.

based on the undisputed facts, the court concluded at summary judgment that the RSA marks were valid. *Supra* at ¶ 11.

Whether or not this Pennsylvania decision has or will have preclusive effect, it is highly persuasive evidence to support the likelihood that Precision will be successful on its validity claim: Precision has been successful on this exact issue before another court, which has rejected the arguments made by AVStar on a fully developed record as failing to raise disputed questions of material fact. That opinion is detailed and thorough, and the evidence Precision has presented in this case confirms the strength of Precision's validity argument. The likelihood of success is even stronger as to those trademarks registered on the Principal Register. 15 U.S.C. § 1057(b) ("[R]egistration of a mark upon the principal register . . . shall be prima facie evidence of the validity of the registered mark . . . .").

B. Likelihood of Confusion

In addition to showing validity, Precision must also show that there is a likelihood of confusion. *Lone Star Steakhouse & Saloon*, 43 F.3d at 930. Because Precision does not assert the alpha-numerical suffixes that are part of its RSA marks and that the defendants are using are, by themselves, trademarks, *see* Doc. 1 at ¶¶ 15, 47, Precision's likelihood of success depends on the likelihood of confusion between the entire RSA mark and the entire LFC mark, *e.g.*, "LFC-5AD1" vs. "RSA-5AD1."

1. AVStar's Intent

When a newcomer copies its competitor's trademark with the intent to exploit the goodwill created by an already registered trademark, courts presume there is a likelihood

of confusion.  *Shakespeare Co. v. Silstar Corp. of Am., Inc.*, 110 F.3d 234, 239 (4th Cir. 1997); *Osem Food Indus., Ltd. v. Sherwood Foods, Inc.*, 917 F.2d 161, 165 & n.8 (4th Cir. 1990); *AMP Inc. v. Foy*, 540 F.2d 1181, 1186 (4th Cir. 1976).  In the context of a motion for a preliminary injunction, the newcomer has the burden to rebut this presumption.  *Osem Food Indus.*, 917 F.2d at 165.

Here, the evidence is overwhelming that AVStar intentionally copied Precision's RSA mark when they began selling servos with the identical RSA mark.  *See supra* ¶ 17. And the inference that AVStar intended to copy the RSA suffixes into the LFC marks and to continue to trade on the goodwill associated with Precision's RSA mark after it lost the Pennsylvania case is quite strong.

After losing in Pennsylvania, AVStar chose to continue using the same suffixes that Precision and its predecessors have used for decades as part of its RSA marks and that AVStar had been infringing.  The FAA did not require AVStar to use these suffixes, nor is it required for function, as AVStar sells identical servos to Continental without the RSA suffixes.  *Supra* ¶¶ 29, 33.  The inference is clear:  AVStar wants the benefit of Precision's RSA marks and chose to use the RSA suffixes to obtain the continued benefit of Precision's goodwill.  Accordingly, there is a presumption that a likelihood of consumer confusion arises.  *See Shakespeare Co.*, 110 F.3d at 239.

AVStar has presented virtually no evidence to rebut this presumption or to support its contention that there is no likelihood of consumer confusion.  To the extent AVStar contends that the differences in the two marks reduce the likelihood of confusion, it has not supported that assertion with any evidence.  AVStar maintains the Pennsylvania court

"observed that simply adding another prefix before 'RSA'" would be enough to avoid a likelihood of confusion, and that AVStar "went a step further" by changing to the LFC mark. Doc. 29 at 23. However, the Pennsylvania court merely noted in a footnote that it would have been a "different case entirely" if AVStar's mark had not been identical to Precision's mark, not that it would prevent a likelihood of confusion. *AVCO Corp.*, 2018 WL 1706359, at *10 n.107. And it is a different case, as this lawsuit shows.

Moreover, a *de minimis* fix does not automatically defuse the likelihood of confusion, and if anything, AVStar's prior infringement—which the Pennsylvania court found caused a likelihood of confusion—increases the likelihood that consumers will continue to be confused by the minimal changes AVStar made to Precision's trademarks. *See Innovation Ventures, LLC v. N2G Distrib., Inc.*, 763 F.3d 524, 544 (6th Cir. 2014) (noting in the context of a contempt motion that "[o]nce a party infringes on another's trademark or trade dress, the confusion sowed is not magically remedied by *de minimis* fixes").[4]

AVStar further contends that the context in which the marks are viewed eliminates any likelihood of confusion that may still exist. Doc. 29 at 24–25. AVStar notes the FAA has approved its LFC servos, which indicates that they meet safety requirements,

---

[4] The holding in *Innovation Ventures* arose in the application of the "safe distance rule" during a contempt proceeding. That rule does not necessarily apply at the preliminary injunction stage. Indeed, the safe distance rule is not a substitute for likelihood of confusion, *see* 5 MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 30:21 (5th ed. September 2019 Update). But the fact that the safe distance rule may not be directly applicable does not mean that AVStar's prior infringement and continued partial copying are irrelevant or not worthy of any weight in evaluating whether a very similar mark is likely to cause confusion with a protected mark.

*supra* ¶¶ 26–27, and contends there are no quality differences. But that is not determinative, and indeed, the context here is no different than before, when AVStar's use—also approved by the FAA and with minimal quality differences—did create a likelihood of confusion. *See AVCO Corp.*, 2018 WL 1706359, at *10 n.107. And AVStar has not provided evidence that simply changing three letters on a model number alters the context in any significant way.

AVStar also points to the fact that there does not appear to be actual confusion between LFC and RSA servos. While this evidence is relevant to the traditional analysis of likelihood of confusion discussed below, it is not sufficient to overcome the presumption arising from AVStar's intent. *See Shakespeare*, 110 F.3d at 239 (The presumption of a likelihood of confusion follows intentional copying unless the actor acted "in good faith under circumstances that do not otherwise indicate an intent to cause confusion or to deceive.").

Because the evidence is strong that AVStar intentionally copied the suffixes used by Precision in its valid RSA trademarks after having intentionally copied, used, and infringed the entire RSA mark for years, and that it did so in bad faith to obtain the benefit of Precision's goodwill in the mark, there is a presumption of confusion. AVStar has not rebutted this presumption, and thus Precision is likely to prevail on its claim that there is a likelihood of confusion.

## 2. The Evidence as a Whole

Alternatively, Precision has shown likelihood of confusion upon analysis of the relevant factors identified by the Fourth Circuit. Those factors are: 1) the strength or

distinctiveness of the mark; 2) the similarity of the two marks to consumers; 3) the similarity of the goods or services the marks identify; 4) the similarity of the facilities the two parties use in their businesses; 5) the similarity of the advertising used by the two parties; 6) the defendant's intent; 7) actual confusion; 8) the quality of the defendant's product; and 9) the sophistication of the consuming public. *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 153 (4th Cir. 2012). Not all of these factors are of equal importance, "nor are they always relevant in any given case." *Anheuser-Busch, Inc. v. L & L Wings, Inc.*, 962 F.2d 316, 320 (4th Cir. 1992). The likelihood of confusion between marks is "an inherently factual issue that depends on the unique facts and circumstances of each case." *Id.* at 318.

First, Precision is highly likely to be successful in showing its marks are strong and distinctive. "The strength of a mark is the degree to which a consumer in the relevant population, upon encountering the mark, would associate the mark with a unique source." *CareFirst of Maryland, Inc. v. First Care P.C.*, 434 F.3d 263, 269 (4th Cir. 2006). A mark's strength "is evaluated in terms of its conceptual strength and commercial strength." *Id.*[5]

---

[5] Conceptual strength depends in part upon a mark's placement into a category of distinctiveness: generic, descriptive, suggestive, or arbitrary or fanciful—with generic marks having the weakest strength, and arbitrary or fanciful the most. *George & Co. LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 393–94 (4th Cir. 2009). Commercial strength, on the other hand, looks to the marketplace and asks whether consumers recognize the mark "to refer to a particular person or business enterprise." *CareFirst*, 434 F.3d at 269.

Precision and its predecessors used the RSA marks for decades, *supra* ¶ 2, and no one else used Precision's RSA marks before AVStar began infringing, *supra* ¶ 15; *see CareFirst*, 434 F.3d at 270 ("A strong trademark is one that is rarely used by parties other than the owner of the trademark, while a weak trademark is one that is often used by other parties."). Consumers associate the RSA marks in full and the RSA suffixes with Precision servos. *Supra* ¶ 9. The RSA marks are distinctive, as they are descriptive, *see* Doc. 29 at 20–22; Doc. 7 at 14–15, and have acquired secondary meaning, *see supra* ¶¶ 9–10; *AVCO Corp.*, 2018 WL 1706359 at *5–8; *see also Dayton Progress Corp. v. Lane Punch Corp.*, 917 F.2d 836, 839 n.6 (4th Cir. 1990) (where, as here, "the second comer intentionally copies the mark of a senior user, there is a presumption of secondary meaning"). Thus, Precision's marks are both conceptually and commercially strong.

Precision's RSA marks and the defendants' LFC marks are also similar in significant ways. While the prefixes are not identical, they each consist of a sequence of three capital letters, and these three-letter prefixes are followed by identical suffixes. *Supra* ¶¶ 3, 23. The overall presentation of the marks on the servos is similar. *See* Doc. 29-3 at 4–5. While both Precision's and AVStar's brand names appear elsewhere on the servos, the names are not a part of the model number. *Id.*; *see Ideal Indus., Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1021–25 (7th Cir. 1979) (holding likelihood of confusion between model numbers existed even though competing companies' brand names were on the actual parts). Nor was the presence of AVStar's brand name sufficient to prevent actual confusion before the marks were changed from "RSA" to "LFC." *See AVCO Corp.*, 2018 WL 1706359 at *10 n.107 ("[T]here is no evidence that

AVStar is strong or well-known," such that a servo labelled with "AVStar" would reduce a likelihood of confusion.); Doc. 7-4 at ¶¶ 10–11.  And the marks are similar enough so that even with different prefixes, customers who receive a servo bearing one of AVStar's marks would likely "call Precision to confirm it was one of their units," Doc. 7-14 at ¶ 9, and AVStar's servos with the LFC mark appear to consumers "to be a variant of Precision's RSA line."  Doc. 7-13 at ¶ 11.  *See CareFirst*, 434 F.3d at 271 (evaluating similarity of marks by examining use "in the context in which it is seen by the ordinary consumer").

Indeed, in the context of brand names, many courts have held that when a competitor uses distinctive features of an existing mark in order to associate itself with the mark, consumer confusion is likely.  *See Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee en 1772*, 396 F.3d 1369, 1371 (Fed. Cir. 2005) ("VEUVE CLICQUOT" v. "VEUVE ROYALE"); *Coryn Grp. II, LLC v. O.C. Seacrets, Inc.*, 868 F. Supp. 2d 468, 486 (D. Md. 2012) ("SEACRETS" v. "SECRETS"); *Express Welding, Inc. v. Superior Trailers, LLC,* 700 F. Supp. 2d 789, 798–99 (E.D. Mich. 2010) ("NITRO STINGER" and "SINTRO SPREADER" v. "Superior Trailers Nitro Stinger" and "Superior Trailers Nitro Spreader"); *Frank Brunckhorst Co. v. G. Heileman Brewing Co., Inc.,* 875 F. Supp. 966, 978 (E.D.N.Y. 1994) ("BOAR'S HEAD" v. "Boar's Head Red").  The same is true in this case as well.

The marks here are not identical, but they are nonetheless similar, especially in context.  This factor weighs moderately in Precision's favor.

Other factors also favor Precision. The servos identified by the marks are functionally identical, and their similarity is not contested. Doc. 29 at 27; Doc. 7 at 16. The parties are direct competitors in the same market for the same customers and use some of the same advertising channels. *See* Doc. 7-12 at ¶ 9.

There are factors where the evidence weighs against a likelihood of confusion, but the weight is not heavy. The consuming public for these servos is sophisticated and knowledgeable about aircraft components, but there was still substantial confusion when AVStar began selling its RSA servos, *see AVCO Corp.*, 2018 WL 1706359, at *10, and there is persuasive evidence that the likelihood of confusion will continue with the LFC servos (using the Precision suffixes). *See* Doc. 7-13 at ¶¶ 8–11; Doc. 7-14 at ¶¶ 6–10.

As AVStar points out, there is no evidence of actual confusion, but this is not surprising. The LFC servos had only been on the market approximately nine months when Precision filed its complaint. And there is no evidence of the actual number of sales to give context to the lack of actual confusion. And, of course, the law does not require actual confusion. *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir. 1984).

While there may be some quality differences between servos made by Precision and those made by AVStar, that evidence is anecdotal and not strong. *See* Doc. 7-4 at ¶¶ 12–14; Doc. 7-5 at ¶¶ 7–14. The FAA heavily regulates the use of aircraft engine parts, and AVStar's LFC servos have obtained FAA approval, indicating that any quality differences do not affect safety. Doc. 29-2 at ¶¶ 12–13. While this factor favors AVStar, it is of little weight when evaluated together with the other evidence, which as a whole favors Precision.

The Precision marks are strong and distinctive, the LFC marks are identical in part and similar overall to the Precision marks, the goods they identify are identical, the parties use some of the same advertising channels, and the defendants intended to copy the suffixes of Precision's marks. These factors outweigh the factors that there has been no actual confusion to date, that the quality of the defendants' product does not impact safety, and that the consuming public is relatively sophisticated. Therefore, Precision has demonstrated a likelihood of confusion between the LFC and RSA marks.

AVStar contends that Precision's marks are functional, weak, and not distinctive. Doc. 29 at 15, 20–21. These arguments were rejected by the Pennsylvania court on a fully developed factual record, which indicates AVStar is unlikely to prevail here. *AVCO Corp.*, 2018 WL 1706359 at *5–*8. Moreover, Precision has offered persuasive evidence that the model numbers themselves are not functional, since AVStar sells servos without the LFC marks and its servos have other product numbers not at issue here that are the functional designations for the servos. *Supra* ¶ 29. Finally, AVStar has presented no evidence that any manufacturer other than Precision and its predecessor has used the suffixes to identify servos, so no evidence supports AVStar's contention that the suffixes "have been in use in the aviation industry . . . for the [sole] purpose of describing functional features of Lycoming servos . . ." for years. Doc. 29-3 at ¶ 18; *see also AVCO Corp.*, 2018 WL 1706359, at *8. Precision's marks have been identified in the market as a strong mark with secondary meaning; they are not a universal language for servos.

AVStar also contends that "alphanumeric designations on products cannot serve as trademarks." Doc. 29 at 18–19. However, the cases cited by AVStar denied protection

16

to alphanumeric marks that were found to be descriptive but lacked secondary meaning. Doc. 29 at 18; *see J.M. Huber Corp. v. Lowery Wellheads, Inc.*, 778 F.2d 1467, 1469–70 (10th Cir. 1985); *W.H. Brady Co. v. Lem Prods., Inc.*, 659 F. Supp. 1355, 1367 (N.D. Ill. 1987); *In re Certain Sickle Guards Intended for Use in Mowing Mach.*, Inv. No. 337-TA-247, USITC, 197 WL 123833 at *15 (Feb. 18, 1987) (Initial Determination). Precision has demonstrated here that its marks have attained secondary meaning. *Supra* ¶¶ 8–10.

Finally, AVStar contends that its use of the LFC marks is a "fair use." Doc. 29 at 29. A defense of fair use will protect an infringer of a trademark who proves the infringing marks "are used fairly and in good faith" as a description and "not used as a trademark." *Shakespeare Co.*, 110 F.3d at 242. The defense is precluded if the infringing party acted in bad faith. *Id.* AVStar asserts it acted in good faith because it uses the marks in a functional, descriptive sense. Doc. 29 at 29. AVStar made this argument before the Pennsylvania court, which rejected it. *AVCO Corp.*, 2018 WL 1706359, at *10. This argument is unpersuasive here as well given AVStar's prior infringing uses, its use of the LFC marks, and its intent to copy the suffixes.

## II.   Risk of Irreparable Harm

In addition to demonstrating a likelihood of success on the merits, Precision must "make a clear showing that it is likely to be irreparably harmed absent preliminary relief." *Real Truth about Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 347 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010), *reinstated in relevant part*, 607 F.3d 355 (4th Cir. 2010). A party suffers irreparable injury if monetary damages are

inadequate or difficult to ascertain.  *Dynamic Aviation Grp. v. Dynamic Int'l Airways, LLC*, No. 5:15-CV-00058, 2016 WL 1247220, at \*27 (W.D. Va. Mar. 24, 2016).

An injunction is the standard remedy in a trademark infringement case, *see* 5 *McCarthy* § 30:1, as it protects the infringed parties' right in their trademark and maintains the status quo.  *Microsoft*, 333 F.3d at 525; *Dep't of Parks & Rec. for State of California v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006); *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 196–97 (3d Cir. 1990).  An injunction is the appropriate remedy in this case.

Precision has demonstrated that there is a likelihood of confusion between its valid marks and AVStar's LFC marks, and this confusion will continue unless AVStar stops selling the servos with the infringing marks.  This confusion is difficult to quantify.  *See Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 741 (7th Cir. 2013) (In affirming a preliminary injunction, the court noted "irreparable harm is especially likely in a trademark case because of the difficulty of quantifying the likely effect on a brand of a nontrivial period of consumer confusion (and the interval between the filing of a trademark infringement complaint and final judgment is sure not to be trivial).").  Money damages may provide partial compensation for some of Precision's lost sales, but it is highly doubtful they would be adequate to cover other kinds of injuries.[6]

---

[6]    Trademark law recognizes this inherent difficulty by allowing a trademark holder to recover damages based on the infringer's profits, *see Synergistic Int'l, LLC v. Korman*, 470 F.3d 162, 174 (4th Cir. 2006), which is not an ordinary measure of damages.

Indeed, the mere loss of control over one's reputation is an injury in a trademark sense. *See Pizzeria Uno*, 747 F.2d at 1535. And trademarks give their holders a constitutionally protected property interest, which includes the right to exclude others. *See College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 673 (1999) (discussing the nature of trademarks). In other words, holders of valid trademarks have a right to decide who gets to use the marks and to exclude whom they wish. These kinds of injuries are difficult to quantify, and money damages are unlikely to remedy the otherwise incalculable harm to property rights and loss of control over the mark. *See McCarthy* § 30.1.

Here, AVStar has been infringing Precision's trademark rights for years, selling several thousand servos bearing Precision's exact mark. *See* Decl. of Ronald Weaver, *AVCO Corp.*, No. 4:12-cv-01313-MWB, Doc. 370-2 at ¶ 12 (M.D. Pa. May 25, 2018). When a Pennsylvania court held that AVStar was infringing, they made a minimal change to the mark, spent a few thousand dollars to obtain FAA approval for the same servo with the new mark, and continued to sell servos with marks similar to Precision's mark, in direct competition with Precision. *Supra* ¶¶ 22–23, 28, 31–32. This continued and ongoing loss of control and injury to the right of exclusion harms Precision and harms the value of its trademarks. This is so even if AVStar's servos are of a comparable quality. An injunction preserves Precision's property rights and stops the bleeding.

Nor is it likely that a permanent injunction at the end of the case would fully protect Precision's rights, for two reasons. First, the Pennsylvania court declined to grant a permanent injunction after finding intentional trademark infringement because AVStar

had ceased using the infringing RSA marks.  Doc. 7-10 at 2.  Yet AVStar switched to a mark that is identical in part and similar in overall appearance to the infringing mark it had been using.  Allowing AVStar to continue using the LFC marks while this case proceeds to trial would allow the confusion caused by AVStar's initial infringement to continue unabated and would encourage AVStar to simply make another minimal change should it lose again.

Second, a recall of infringing servos is unlikely, and the harm from LFC servos being placed into airplanes will continue for years.  These servos become a part of engines, which are installed in airplanes.  The Pennsylvania court refused to require AVStar to recall the infringing servos because it would "(1) seriously inconvenience consumers owning AVStar's RSA-marked fuel injectors and (2) create the possibility of danger due to the disassembly and reassembly of aircraft that currently utilize AVStar-manufactured, RSA-marked fuel injectors."  *Id.*  Such concerns would no doubt be raised by AVStar again if Precision prevails, so that a permanent injunction may not be available to fully cure the infringement.  Once these servos enter the marketplace and are installed in airplanes, they are difficult and expensive to safely remove.  *See* Doc. 7-8.  And it would remain necessary to include references to the infringing marks in operation and maintenance manuals because LFC servos will remain in the field.  *See generally id.*  Thus, the negative effects of AVStar's sale of infringing servos are likely to continue for many years, even if Precision ultimately wins the case.  If AVStar sells additional servos during the pendency of this case, that harm cannot be remedied.

Finally, a preliminary injunction seems especially appropriate given that Precision's predecessor was forced into bankruptcy in part due to AVStar's previous infringing use and the dispute that followed, Doc. 7-2 at ¶ 8, and Precision and AVStar are direct competitors. *See Multi-Channel*, 22 F.3d at 552 (noting "the possibility of permanent loss of customers to a competitor" can satisfy the irreparable injury prong). While there is no evidence that Precision is having financial problems as a result of AVStar's current infringement, the difficulties encountered by Precision's predecessor indicate that the financial consequences of trademark infringement in this specific market can be severe and long-lasting.

In the absence of a preliminary injunction, Precision's property rights will likely be irreparably harmed. Indeed, "a finding of irreparable harm usually follows a finding of unlawful use of a trademark and a likelihood of confusion." *George Sink, P.A. Injury Lawyers v. George Sink II Law Firm LLC*, 2:19-cv-01206, 2019 WL 3766478, at *12 (D.S.C. Aug. 9, 2019).

AVStar's only real argument against irreparable harm is that Precision's delay in filing suit belies its arguments about irreparable harm. Doc. 29 at 31–32. Precision's timing does not undermine its arguments. AVStar first notified Precision of its intent to use the LFC marks in the Pennsylvania case in May of 2018. Doc. 7-7 at 14. However, it was not clear then when or if the LFC marks would actually be used. *See id.* When Precision learned that AVStar was selling servos to Continental some months later, it also learned that those servos did not have the LFC mark, indicating that perhaps AVStar had decided against using the LFC marks. Doc. 7-12 at ¶ 8. Precision presented evidence

that it did not actually become aware of AVStar's transition to the LFC marks until April of 2019 when Precision's president obtained an email chain which included employees from AVStar confirming the use of the LFC marks, Doc. 7-12 at ¶ 9, and AVStar has presented no evidence to rebut this. Precision filed this lawsuit and the motion for preliminary injunction in May 2019, Docs. 1, 6, soon after learning the LFC servos were on the market. The timing of the motion does not significantly undermine Precision's evidence of irreparable harm.

Precision and AVStar disagree as to whether the Court should apply a presumption of irreparable harm in this case. Doc. 29 at 30–31; Doc. 33 at 10. AVStar contends there is no presumption of irreparable harm in a trademark case, citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006). In *eBay*, the Supreme Court held the decision of whether to grant injunctive relief in a patent case "rests within the equitable discretion of the district courts, and that such discretion must be exercised consistent with traditional principles of equity"; the court cannot presume irreparable harm after finding patent infringement. *See id.* at 393–94. Some federal circuits have extended the rationale of the Supreme Court's ruling in *eBay* to trademark infringement cases,[7] but the Fourth Circuit has not done so.[8] District courts in the Fourth Circuit continue to apply the

---

[7] *See, e.g.*, *Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 215–16 (3d Cir. 2014); *Herb Reed Enters., LLC v. Florida Entm't Mgmt., Inc.*, 736 F.3d 1239, 1248–49 (9th Cir. 2013); *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 539 (S.D.N.Y. 2011), *aff'd*, 511 F. App'x 81 (2d Cir. 2013).

[8] In an unpublished case, the Fourth Circuit did extend *eBay* to copyright infringement and noted that courts should rely on "well-established principles of equity" instead of presumptions. *Bethesda Softworks, L.L.C. v. Interplay Entm't Corp.*, 452 F. App'x 351, 354–55 (4th Cir. 2011).

presumption in trademark cases, s*ee, e.g.*, *George Sink*, 2019 WL 3766478, at *12 (rejecting invitation to remove presumption since "[t]rademark harms are inherently different than harms that can be quantified and redressed through later monetary damages"),[9] and the leading commentator in this field has rejected the argument that *eBay* precludes use of a presumption in trademark cases. *McCarthy* § 30.47.70.

In any event, the court need not resolve this question because the facts in this case support an independent finding of irreparable harm. *Dynamic Aviation Grp.*, 2016 WL 1247220, at *28 n.18. Precision has demonstrated it is likely to suffer irreparable harm absent a preliminary injunction, which supports an injunction against the further sale or marketing of servos bearing the "LFC" marks.

Precision also seeks to recall AVStar servos already in use. Certainly there is irreparable harm from leaving these servos in airplane engines, where they may be used, repaired, and maintained for many years. However, because the balance of equities does not favor a recall, *see* discussion *infra*, the Court need not discuss irreparable harm further.

---

[9] To cite just a few of the district court opinions applying the presumption in a trademark case since *eBay* and *Bethesda*: *Choice Hotels Int'l, Inc. v. A Royal Touch Hosp., LLC (NC)*, No. 7:17-cv-381, 2019 WL 4017247, at *6 (W.D. Va. Aug. 26, 2019); *La Michoacana Nat., LLC v. Maestre*, No. 3:17-cv-00727-RJC-DCK, 2018 WL 2465478, at *3 (W.D.N.C. June 1, 2018); *Mayson-Dixon Strategic Consulting, LLC v. Mason-Dixon Polling & Strategic Consulting, Inc.*, 324 F. Supp. 3d 569, 580 (D. Md. 2018); *Rainbow Sch., Inc. v. Rainbow Early Educ. Holding LLC*, No. 5:14-CV-482-BO, 2016 WL 7243538, at *3 (E.D.N.C. Dec. 14, 2016), *aff'd on other grounds*, 887 F.3d 610 (4th Cir. 2018).

III.    Balance of Equities

The balance of equities tips in Precision's favor to the extent Precision seeks an injunction prohibiting AVStar from selling servos with the LFC mark while this litigation proceeds.  Doc. 6 at 1; Doc. 7 at 24.  Such an injunction would not prevent AVStar from marketing or selling its servos altogether; it can still sell servos, as evidenced by its manufacture and sale of servos to Continental Aerospace Technologies bearing the CFC marks without the use of LFC suffixes.  Doc. 7-12 at ¶¶ 7–8.  As noted *supra¸* AVStar's intent when it chose to switch only "RSA" to "LFC" while retaining identical suffixes weighs against AVStar here as well.

AVStar maintains that it expended "significant resources" in switching the model numbers associated with its servos.  Doc. 29 at 32.  But the evidence shows that the costs were only approximately $8500, *supra* ¶ 28; this is a minimal amount in the larger picture.  Moreover, AVStar can immediately sell the servos with the CFC marks, and if another mark is needed for sales to other customers, it should be able to obtain quick FAA approval for a non-infringing mark and be back on the market within a few months, as its recent history changing from the RSA mark to the LFC mark shows.  *See supra* ¶ 26.  That is substantially less time than it will take to resolve this lawsuit on the merits, even if it moves expeditiously to conclusion.

Precision also asks that AVStar be compelled to pay to replace all servos distributed that bear the "LFC" marks and to compensate all its customers for the removal those LFC servos.  Doc. 6-1 at ¶ C.  It has not, however, supported this request with any

evidence or argument. The Court has no record on which to conclude that a recall of servos that no longer belong to the defendants is fair and equitable.

Moreover, the cost, inconvenience to consumers, and safety concerns suggest that a recall of servos that are already installed in airplanes is not appropriate. The Pennsylvania court rejected Precision's request for a recall due to these same concerns. *See supra*. Precision has not established that the equities favor a recall of already installed servos bearing AVStar's LFC marks.

However, to the extent AVStar retains any ownership interest in any servos or engines containing servos with infringing marks, and those servos or engines have not been installed in airplanes, it is appropriate to enjoin sale or further distribution of those servos. In such cases, the concerns enumerated above are not present. AVStar will be prohibited from selling, transferring, or distributing any such servos, and to the extent the servos are not within its possession or direct control, it shall arrange to have those servos or engines returned or take other appropriate action to ensure they are not transferred, sold, or distributed.

IV.    Public Interest

"There is a strong public interest in preventing trademark infringement." *Rebel Debutante LLC v. Forsythe Cosmetic Grp., Ltd.*, 799 F. Supp. 2d 558, 581 (M.D.N.C. 2011). "Indeed, the purpose of a trademark is to protect the public from confusion about the identity of the enterprise from which goods and services are purchased." *Id.* AVStar can still compete in the market with its CFC servos and with any other non-infringing mark; to the extent a new mark is needed, it should only take a few months to obtain

FAA approval. Thus, an injunction against ongoing sales of LFC servos will not harm competition and it will enhance fair competition.

Precision has not established that a recall of servos AVStar has already sold, particularly those that are already in airplanes, is in the public interest. The same reasons discussed in evaluating the balance of the equities apply here.

V.    Bond

Rule 65(c) of the Rules of Civil Procedure specifies that a "court may issue a preliminary injunction . . . only if the movant gives security." Fed. R. Civ. P. 65(c); *Pashby v. Delia*, 709 F.3d 307, 331–32 (4th Cir. 2013). The Court has the discretion to set the bond amount as it sees fit or waive the security requirement. *Pashby*, 709 F.3d at 332 ; *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.,* 174 F.3d 411, 421 (4th Cir. 1999).

The Court must determine the amount of a bond based on record evidence. *Lab. Corp. of Am. Holdings v. Kearns*, 84 F. Supp. 3d 447, 465 (M.D.N.C. 2015). "The burden of establishing the bond amount rests with the party to be restrained, who is in the best position to determine the harm and will suffer from a wrongful restraint." *Id*. And in setting the bond amount, the court "should be guided by the purpose underlying Rule 65(c), which is to provide a mechanism for reimbursing an enjoined party for harm it suffers as a result of an improvidently issued injunction . . . ." *Hoechst*, 174 F.3d at 421 n.3. Ordinarily, then, the amount of the bond "depends on the gravity of the potential harm to the enjoined party." *Id.*

The parties have said very little about an appropriate security. Precision initially contended that a bond of $1000 would be sufficient, "given the demonstrated ease with

which AVStar can modify the model numbers" and "the relatively short-term sales of such units." Doc. 7 at 26. The defendants suggest that "a significant bond" is appropriate, since they will have to obtain FAA approval to develop an entirely new numbering system, and there are costs to disseminate it to the aviation community. Doc. 29 at 34. In reply, Precision suggests a bond of $8500, which is the amount it cost AVStar to develop and use the LFC servos. Doc. 33 at 12.

Based on the current record, the Court will set the security at $8500. It cost defendants approximately $8500 to switch from the RSA marks to the LFC marks, *supra* ¶ 28, and should the defendants not be able to sell the CFC servos to others, this should be sufficient to cover the defendants' costs and expenses in obtaining FAA approval for a servo with a new, non-infringing mark and in switching to making and selling those servos.

The defendants have offered no other evidence as to damages or costs from lost sales or otherwise if an injunction issues. There is virtually nothing in the record about the number of sales of the LFC servos, and as noted *supra*, the Court infers from the available evidence that those numbers are relatively small. Moreover, should the injunction ultimately be lifted, the defendants will then be able to sell the LFC servos, so any lost sales damages will be minimal. The defendants have not met their burden to establish a larger bond amount based on lost sales or otherwise.

If the defendants believe this bond amount is insufficient to protect them from costs and damages sustained should it later be determined that they have been wrongfully enjoined, at any time they may file a motion to increase the bond, supported by evidence

and a brief.  *See Lab. Corp.*, 84 Supp 3d. at 466.  Any response in opposition, with supporting evidence, must be filed within ten business days, and any reply must be filed within five business days.

**CONCLUSION**

Precision has demonstrated it is likely to succeed on the merits, including a showing of likelihood of confusion.  Precision is likely to experience irreparable harm from both future sales and, very likely, from sales to date.  As to an injunction barring future sales, the balance of equities and the public favor a preliminary injunction.  A bond of $8500 is sufficient to protect the defendants' interests.

However, the balance of equities and the public interest do not support a preliminary injunction requiring the defendants to recall servos already sold.  The motion will be denied to the extent Precision seeks an order to recall servos that have been installed in airplanes or that it no longer owns.

The Court will also deny Precision's motion to the extent it seeks to extend its injunction to its "RSA" marks.  The use of the RSA marks is an issue that was decided before the Pennsylvania court, and Precision has not asserted a duplicative claim here for AVStar's past infringement by use of the full RSA marks.  Precision has not explained why this Court should include a prohibition against using the full RSA mark in any injunction.

Accordingly, it is **ORDERED** that the plaintiffs' motion for a preliminary

injunction, Doc. 6, is **GRANTED IN PART** and **DENIED IN PART** as stated herein.

The injunction shall issue separately.

This the 30th day of September, 2019.

_____
UNITED STATES DISTRICT JUDGE